In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2947

JOHNNIE L. SAVORY,

*Plaintiff-Appellee,*

*v.*

ALLEN ANDREWS, *et al.,*

*Defendants-Appellants.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:23-cv-01184 — **Colleen R. Lawless**, *Judge.*

ARGUED SEPTEMBER 11, 2025 — DECIDED AUGUST 14, 2026

Before BRENNAN, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges.*

KIRSCH, *Circuit Judge.* In 1977, police officers in Peoria, Illinois investigated the murder of two teenagers. As part of the investigation, they brought Johnnie Lee Savory to the police department for questioning. Over two days, officers and a private polygrapher interrogated him, at times yelling at him. Eventually, Savory confessed, and he was convicted of two counts of first-degree murder. On appeal, the state court

threw out the conviction because it found Savory's confession was involuntary. Savory was then retried and again convicted. In 2006, he was released on parole, and in 2014, Illinois Governor Patrick Quinn pardoned him.

Savory then filed this suit under 42 U.S.C. § 1983, arguing that 16 former Peoria police officers, the City of Peoria, and private polygrapher Ed Bowers violated his rights. Relevant to this appeal, he contended that officers unlawfully detained him in violation of the Fourth Amendment, that officers and Bowers coerced his confession in violation of the Fifth Amendment, and that officers destroyed and fabricated evidence in violation of the Fourteenth Amendment.

The officers and Bowers moved for summary judgment, arguing that they were entitled to qualified immunity from liability for the unlawful detention, destruction of evidence, and coerced confession claims and that they were entitled to absolute immunity from liability for the fabrication of evidence claim. The district court denied their motion. It found that disputes of material fact precluded review as to the unlawful detention claim, that clearly established law put the officers and Bowers on notice that their tactics to purportedly coerce Savory's confession were unconstitutional, and that a reasonable jury could find that the officers destroyed and fabricated evidence in violation of clearly established law.

We reverse. The officers are entitled to qualified immunity: they had arguable probable cause to detain Savory, no facts show when the missing evidence was destroyed or that they destroyed it in bad faith, and no clearly established law showed that their interrogation tactics were beyond a doubt illegal. Further, because individuals are entitled to absolute immunity regarding their trial testimony, the officers cannot

be held liable, even if they testified consistently with fabricated evidence that was not introduced at trial.

I

We recite only the undisputed facts. On January 18, 1977, Connie Cooper (19 years old) and her brother James Robinson (14) were murdered in their home. Their bodies were found by their mother and stepfather around 4:15 pm. The two teenagers had been stabbed to death, and Cooper's autopsy indicated the presence of sperm or seminal fluid, suggesting that she had been raped. At the crime scene, officers collected evidence, including a black nightstick found on the kitchen floor, a pipe found next to Robinson's body, blood near the victims' bodies, and hairs found on the victims' hands and in the bathroom sink and bathtub. An investigation followed. After about a week, Peoria Police Officers Edgar Haynes and George Pinkney learned that Johnnie Lee Savory (14 years old) had been with Robinson the night before the murders. News footage also showed that Savory was at the scene of the murders after the murders, and an officer documented Savory's presence at the crime scene. Officers Haynes and Pinkney went to Savory's school to ask him questions. Although Savory initially did not want to speak with the officers, he agreed to answer questions at the Peoria Police Department (PPD).

It was a long interrogation. Officers Haynes and Pinkney began questioning Savory inside an interrogation room around 4:00 pm. At a certain point, Detectives Charles Cannon and John Fiers subbed in. Over the course of the interrogation, officers showed Savory photographs of the crime scene, ignored his question about whether he could go home, and accused him of lying. Around 9:30 pm, Savory spoke with

his probation officer. Afterward, the officers asked Savory to take a polygraph test, with one telling him that he could go home after the examination. Savory agreed, and they took him to the polygraph examiner. At 11:30 pm, after the test, Savory received warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966); at that point, he told the officers he didn't want to speak with them.

That night, Savory was held in a detention center. Around midnight, the PPD notified Savory's father that his son was being held. Savory fell asleep at about 1:30 am, and around 8:00 am he was taken back to the PPD to resume questioning. Officers again gave Savory *Miranda* warnings and then asked him rapid-fire and confusing questions. At 10:00 am, he met with his father. Later, at different points, Savory was forced to remove his clothing so that officers could pluck hairs from his body and to take another polygraph test. During the test, the examiner, Ed Bowers, got close to him, raised his voice, and accused him of being a murderer. After the polygraph, Savory stood by the window and cried. At 7:35 pm, about 29 hours after the officers met him at his school, Savory confessed to the murders, though he made no mention of rape or sexual assault.

Later that night, Savory changed his story and denied his involvement in the murders. Sometime later, the officers collected a knife and pair of pants from Savory's father (though the pants were unlikely to have been worn by Savory given their size). Testing showed blood on a cut-out of the pants. The officers also conducted interviews with witnesses. One explained that he'd seen Robinson and Savory with a nightstick. Further, a news reporter told an officer that Savory had inquired about whether Robinson was alive before the

bodies had been removed from the crime scene. And Savory's foster mother, Marva Jones, told an officer that Savory had come to her in an emotional state and described Cooper's wounds. His statements suggested that he'd seen them.

On February 15, 1977, Savory was indicted on first-degree murder charges. Before the 1977 trial, officers interviewed Tina, Ella, Ruby, and James Ivy. The group told the officers that Savory was at their house on the day of the murders from approximately 1:00-3:00 pm, about an hour before the victims' bodies were found. The officers say the Ivys additionally provided other, disputed information, but that evidence was not used at trial. A jury convicted Savory after the Illinois trial court denied his motion to suppress his confessions. In 1980, the state appellate court reversed and remanded, finding that Savory's confession wasn't voluntary.

In 1981, Savory was tried again and was again found guilty. This time, the trial included evidence from the Ivy children, with whom the police had reconnected. Tina, Ella, and Frank Ivy testified that Savory said he had cut Robinson accidentally, but that Robinson was all right when Savory left. Savory was sentenced to 40-80 years in prison.

In 1983, Tina and Frank Ivy signed affidavits recanting their testimony. Afterward, Savory filed a post-conviction petition claiming that he was entitled to a new trial, but it was denied by the state trial court and affirmed on appeal. A year later, Savory filed a petition for a writ of habeas corpus in federal court, but this too was denied and then affirmed on appeal. *United States ex rel. Savory v. Lane*, No. 84 C 8112, 1985 WL 2108, at *4 (N.D. Ill. July 25, 1985), *aff'd*, 832 F.2d 1011 (7th Cir. 1987). In 2003, Frank Ivy signed another affidavit stating

his 1981 testimony was incorrect and that he felt pressured by an officer to make false statements.

In 2006, Savory was released on parole. Six years later, he filed a motion for post-conviction DNA testing, seeking to have the hairs from the crime scene and the original cut-out of the pants taken from Savory's father tested to prove his innocence. The petition was granted, but testing was impossible because the department had not preserved the evidence. (Tests of the remainder of the pants did not indicate the presence of blood.) In 2014, Savory filed a motion for a new trial, but as it was pending, Illinois Governor Patrick Quinn pardoned him.

In 2017, Savory sued 16 former Peoria police officers, the City of Peoria, and private polygrapher Bowers under 42 U.S.C. § 1983, alleging (as relevant here) that they unlawfully detained him in violation of the Fourth Amendment, coerced a confession from him in violation of the Fifth Amendment, and fabricated and destroyed evidence in violation of the Fourteenth Amendment. The case was originally dismissed as untimely, but that determination was overturned by our en banc court. See *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc). In 2023, the case was transferred to the Central District of Illinois. The officers and Bowers moved for summary judgment, raising qualified and absolute immunity defenses. The district court denied their motion. The officers and Bowers now appeal the denials of qualified and absolute immunity.

## II

We begin with jurisdiction. See *Villalobos v. Picicco*, 168 F.4th 1057, 1061 (7th Cir. 2026). Typically, we only have

jurisdiction over final judgments. 28 U.S.C. § 1291. But because an entitlement to qualified or absolute immunity "is an *immunity from suit* rather than a mere defense to liability," we can sometimes review the district court's denial of summary judgment on qualified or absolute immunity grounds. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). But we may only review "where the appeal focuses exclusively on legal questions about immunity, rather than factual disputes tied up with the merits of the case." *Mabes v. Thompson*, 136 F.4th 697, 705 (7th Cir. 2025) (citation modified). The line between legal and factual disputes is "not always clear." *Smith v. Whitsel*, 134 F.4th 962, 966 (7th Cir. 2025) (per curiam).

To help us assess whether an appeal focuses on legal arguments, we "closely examine two things." *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021). We first look at whether the district court specified disputes of fact as the reason for denying qualified immunity. *Id.* Second, we review whether the officers on appeal take evidence in the light most favorable to the plaintiff, or whether they instead make back-door efforts to rely on their own version of disputed facts. *Id.* At bottom, the ultimate question is whether "disputed facts affect the qualified immunity analysis." *Mabes*, 136 F.4th at 705. In other words, so long as we can decide the appeal without looking at the genuinely disputed facts, we have jurisdiction. *Id.*

We have appellate jurisdiction to consider the appeal of Savory's Fourth Amendment unlawful detention claim. The district court declared that this claim should go to trial because of genuine disputes of material fact. And the officers do, at times, attempt to contest facts that the district court declared disputed. But the officers' argument doesn't depend on genuinely disputed facts. See *Brumitt v. Smith*, 102 F.4th 444,

448 (7th Cir. 2024) (separating factual and legal arguments). Where the district court has expressed that a fact is disputed, we defer to its judgment. See *Via v. LaGrand*, 469 F.3d 618, 623–25 (7th Cir. 2006). But the district court did not go fact by fact and did not rule on whether certain material facts were disputed. Only where the district court did not express a view on a particular fact do we conduct "our own careful review of the record," and take the facts in a light most favorable to Savory. *Mabes*, 136 F.4th at 705 (citing *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). Under this approach, which we utilized in *Mabes*, we find that we have jurisdiction and can resolve the officers' assertion of qualified immunity on the merits, considering the undisputed facts in the record. See *id.*

The district court also denied immunity to the officers as to the coerced confession and the fabrication and destruction of evidence claims. In doing so, it did not identify factual disputes as the basis for denying summary judgment. And (with respect to these claims) the defendants accept plaintiff's version of the facts. Therefore, we have appellate jurisdiction to decide these claims of immunity on an interlocutory basis.

## III

"Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (citation modified). That means when officers don't "violate clearly established statutory or constitutional rights of which a reasonable person would have known," they cannot be held liable. *Id.* The officers argue they are entitled to qualified immunity for the unlawful detention, coerced confession, and destruction of evidence claims. So, Savory must show that the officers violated the law and that their conduct was clearly

established as unlawful. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018); *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (showing the plaintiff bears the burden of proving a right was clearly established). The standard is primarily identified in objective terms, and it requires courts to look back to the law at the time of the official's acts, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to know that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation modified). Thus, we'll have to analyze the law as it stood back when the acts occurred. We construe facts in favor of Savory, and the officers must "accept the district court's view [when the court assessed] that there are factual disputes." *Manery v. Lee*, 124 F.4th 1073, 1077–78 & n.5 (7th Cir. 2025) (citation modified).

A

We first consider the detention liability claim, which Savory, at oral argument, clarified was for the period between his indictment and his first conviction. "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed arrests or investigatory detentions." *Davis v. Mississippi*, 394 U.S. 721, 726–27 (1969) (citation modified). At the same time, in our case, if the officers had probable cause to detain Savory, the detention could have been valid. See *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is a fact-dependent, "nontechnical … compromise" that looks to protect citizens from law enforcement without "unduly hamper[ing]" its function. *Id*. "[G]ood faith is not enough to constitute probable cause." *Dir. Gen. of R.Rs.*

*v. Kastenbaum*, 263 U.S. 25, 28 (1923). Rather, it must be that a "prudent man" would "believe that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111–12 (1975) (citation modified). Because "a reasonable officer could have mistakenly believed that probable cause existed," our inquiry to decide qualified immunity is whether the defendants had "arguable probable cause" to detain Savory. *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 655–56 (7th Cir. 2024) (citation modified).

Whether arguable probable cause existed depends on the totality of the circumstances. See *id.* at 656. The district court held that the parties agreed upon certain facts: that the officers found a nightstick and pole at the crime scene; that a witness had seen Robinson and Savory with that nightstick; and that Savory was placed at the scene of the murders after the crime by Officer Glen Perkins and others that reviewed the local news footage. It also said that the "overwhelming majority of the facts surrounding the arrest are disputed." This means that, at the very least, the district court found some facts were undisputed. Looking through the record, we were able to determine additional facts that were not genuinely disputed. See *Mabes*, 136 F.4th at 707 (looking at record evidence); *D.Z. v. Buell*, 796 F.3d 749, 755–56 & n.2 (7th Cir. 2015) (rejecting plaintiff's argument that there was a genuine dispute of fact in the qualified immunity context).

We see no evidence that it was disputed at the district court that the victims were found dead at 4:15 pm or that the nightstick was found in the victims' kitchen. See Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *United States v. Waldrip*, 859 F.3d 446, 449 (7th Cir. 2017) (arguments not made are waived). And Savory did not

contest at the district court that the police collected hairs from the bathroom sink that were consistent in color and characteristic with Savory's hair. See Fed. R. Civ. P. 56(e); *Waldrip*, 859 F.3d at 449. To the extent that there is a dispute, it is as to the scientific validity of the comparison. And even then, challenging the scientific validity of the comparison is not the same as challenging what a prudent officer would have thought about the comparison. See *Gerstein*, 420 U.S. at 111. Further, in his Rule 56 motion at the district court, Savory did not properly controvert the asserted fact—that a news reporter told Officer Marcella Teplitz that Savory had asked about whether Robinson was dead before the bodies were removed from the house. There's evidence that Savory did not make the statement to the reporter, but that does not create a genuine dispute of fact as to what the reporter told Officer Teplitz. Fed. R. Civ. P. 56(e); *Waldrip*, 859 F.3d at 449. Nor did he adequately controvert that his foster mother, Marva Jones, told officers that he approached her in an emotional state and told her that the murderer "slit her stomach wide open, Marva, you should have seen it." While there's evidence that Savory never made that statement to Jones, Savory's testimony that he didn't make the original statement to Jones doesn't create a genuine dispute of fact as to what Jones told the officers because he had no firsthand knowledge of the interview. See Fed. R. Civ. P. 56(a).

These facts, taken together, are enough to give rise to arguable probable cause. See *Schimandle*, 114 F.4th at 655–56. Even if Savory did not ask the reporter about whether Robinson was alive or describe Cooper's wounds to Jones, the officers could have reasonably trusted the witnesses' statements. *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) ("So long as an officer reasonably believes [a witness] is telling the

truth, he may rely on the information provided to him by such persons in deciding to make an arrest, without having to conduct an independent investigation into their accounts."). And Savory provided no evidence to suggest that the officers fabricated any of this evidence. The reporter and Jones's statements to police, along with the other undisputed facts, give rise to at least arguable probable cause, so the officers are entitled to qualified immunity. See *Schimandle*, 114 F.4th at 655–56.

B

The officers next ask us to overturn the district court's denial of qualified immunity for the destruction of evidence claim. First, the officers argue that the district court did not address the issue of qualified immunity as to this claim in violation of Circuit Rule 50. See 7th Cir. R. 50. Circuit Rule 50 requires the district court to state its reasons for resolving a claim. *Id.* Our circuit's "customary approach" to resolving a violation of this rule is to remand. *W. States Ins. Co. v. Wis. Wholesale Tire*, 148 F.3d 756, 759–60 (7th Cir. 1998). But because we have sufficient information to decide this issue and the officers do not request a remand given the extensive length of this litigation, we proceed to the merits.

Savory argues that Detectives Walter Jatkowski and Cannon destroyed the blue pants cut-out and that Detectives Pinkney and Fiers, as well as Officer Jatkowski destroyed the hairs found on the victims' hands in violation of the Fourteenth Amendment. The hairs, we note, are not the same as those found in the sink; because it didn't look like Savory's hair, this evidence would only be relevant insofar as it could help identify another individual who encountered the murder victims. Officers can violate a criminal defendant's

Fourteenth Amendment rights if they destroy evidence in bad faith, the evidence has apparent exculpatory value, and there is no way to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011) (reading *Trombetta* and *Youngblood* together).

Savory's claim fails at both steps of the qualified immunity analysis. Savory didn't show that the officers violated his due process rights. He failed to offer any evidence that the pants cut-out or hairs were destroyed in bad faith or that they had apparent exculpatory value when they were destroyed. As to bad faith, Savory only argues that because the officers acted in supposed bad faith in other contexts, they must have acted similarly with this evidence. But it is not enough to extrapolate bad faith from one context into another. Savory cannot merely speculate: he must offer some evidence that they destroyed that specific evidence in bad faith. See *United States v. Holly*, 940 F.3d 995, 1001–02 (7th Cir. 2019). He has also failed to provide any evidence on when the items were destroyed. And at summary judgment, the plaintiff cannot rely on "mere allegations," but instead must put forth "specific facts" that we'll take as true. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); Fed. R. Civ. P. 56(e). So, if there isn't enough evidence on the record for Savory to meet his burden, the officers are entitled to summary judgment. Without any evidence suggesting specific facts, we cannot reach any conclusions about whether the cut-out and hairs had apparent exculpatory value. Certainly, in the late 1970s or early 1980s, officers were not required to predict scientific advances in DNA testing technologies. See *Trombetta*, 467 U.S. at 489 n.10 (the reliability of available testing bears on the evidence's exculpatory—and

therefore its apparent exculpatory—value). And even so, the evidence "was simply an avenue of investigation that might have led in a number of directions." *Youngblood*, 488 U.S. at 56 n.\*; *Hubanks v. Frank*, 392 F.3d 926, 931 (7th Cir. 2004) (evidence that cannot exonerate the petitioner is not apparently exculpatory). Surely, without some proof of when the evidence was destroyed, Savory cannot establish the apparent exculpatory value of the evidence at the time of its destruction.

Regardless, the officers' conduct wasn't clearly established as unlawful by either the Supreme Court or this circuit. In *Trombetta*, the Supreme Court told us that it was not clearly established before 1984 that the government had a "duty to take affirmative steps to preserve evidence on behalf of criminal defendants." *Trombetta*, 467 U.S. at 486. And Savory points us to *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015), to show the officers' actions were shown as clearly established as early as the 1960s. But that case describes the pretrial destruction of evidence. *Id.* at 532. Since Savory doesn't argue when the evidence was destroyed (even conceding at oral argument that the timing of the supposed destruction of evidence didn't matter and that the officers had the duty to preserve the evidence indefinitely), he cannot meet his burden to show that it was clearly established that the officers' conduct was unconstitutional.

## C

We finally consider the district court's denial of qualified immunity as to Savory's coerced confession claim. Savory underwent many hours of interrogation over two days. He was repeatedly questioned, told he could go home after taking a polygraph test, and was told to remove his clothes so that

officers could collect hair samples. Because no clearly established law shows that the officers should have been on notice that their conduct was unconstitutional, we reverse.

The district court cited a string of cases that it found should have put the officers on notice that their tactics were unlawful. But in 1977, it was not beyond debate that the officers' conduct was unconstitutional. See *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). At oral argument, Savory cited *Haley v. Ohio*, 332 U.S. 596, 601 (1948) (plurality) as the precedent with the facts most analogous to those in this case. But despite some factual similarities to our case, *Haley* is not sufficiently analogous. In that case, the police suspected a 15-year-old boy of murder and questioned him for five hours in rotating teams of officers from midnight until 5:00 am. 332 U.S. at 597–98. Before he had been informed of his rights, he verbally confessed. *Id.* at 598; see also *id.* at 610 (Burton, J., dissenting). Only later was he provided with a written confession to sign; that confession included a statement informing him of certain constitutional rights. *Id.* at 598. But at no point was he advised of his right to counsel. *Id.* Around 5:00 am, he signed the written confession. *Id.* at 598–99.

The Court expressed concern with Haley's treatment. It noted that evidence suggested that "he was beaten" by the police, *id.* at 597, and that the record showed that after he confessed, "he was kept incommunicado for over three days," a period during which the lawyer who was retained on his behalf was twice denied the opportunity to see and counsel him. *Id.* at 600. The Court nonetheless did not weigh the evidence that the boy was beaten and the evidence that his lawyer was barred from seeing him. See *id.* That said, it admonished the officers and expressed that "[w]hen the police are so

unmindful of these basic standards of conduct in their public dealings, their secret treatment of a 15-year-old boy behind closed doors in the dead of night becomes darkly suspicious." *Id.* The Court additionally highlighted that, especially where the minor petitioner wasn't informed of his right to counsel (and was later denied access to that right), it could not "indulge the assumption" that Haley had "full appreciation" of his rights. *Id.* at 601 (citation modified). In the end, the Court concluded that, considering the combination of factors, "[t]he Fourteenth Amendment prohibits the police from using the private, secret custody of either man or child as a device for wringing confessions from them." *Id.* at 600–01.

This case has similarities with *Haley*, but they are not enough to overcome our standard. The police gave Savory his *Miranda* warnings and, in doing so, informed him of his right to counsel. When Savory told the officers he did not want to speak with them, the questioning ended. The next morning, the officers once again read him his *Miranda* rights before questioning resumed. At different points, Savory met with his father and probation officer. And only after that did he confess. But in *Haley*, the boy was questioned through the night and never informed of his right to counsel, he was only informed of his other rights after he verbally confessed, and his lawyer was restricted from seeing him.

*Gallegos v. Colorado*, 370 U.S. 49 (1962) is also an inapposite analog. In that case, the "crucial evidence" was a signed confession from the minor suspect. *Id.* at 50. That confession was obtained only after the police held the suspect for five days without a lawyer, parent, or friendly adult, despite at least his mother's efforts to see him. See *id.* 53–54. Savory, like the petitioner in *Gallegos*, was only 14 years old. But that's not

enough: in *Gallegos*, the Court highlighted that age was just one factor of many that "combine[d]" to show a Due Process violation. See *id.* at 55. The other factors are distinguishable. Savory confessed to the murders about 29 hours after he was first questioned and less than a day after he was first given his *Miranda* rights. The petitioner in *Gallegos* was held for nearly five times as long as Savory was. And Savory met with his father and probation officer before he confessed; the petitioner in *Gallegos* was "cut off from contact" with any analogous adult. See *id.* at 54. These differences show that it is not clear that had the officers read the Supreme Court's decision in *Gallegos,* they would have known that their specific conduct was unconstitutional. See *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (per curiam).

Savory points us to other controlling cases, but none put it beyond debate that the officers acted unlawfully. In *Spano v. New York*, 360 U.S. 315 (1959), the officers interrogated the suspect through the night and ignored "his repeated refusals" to answer their questions as well as "his reasonable requests to contact the local attorney whom he had already retained." *Id.* at 322–23. In contrast, Savory was given *Miranda* warnings and the officers ceased questioning after he told them he didn't wish to speak with them. Savory also cites *Payne v. Arkansas*, 356 U.S. 560 (1958) as evidence that the length of his interrogation and lack of food and water gave rise to a constitutional violation. See *id.* at 563–64. But *Payne* is distinguishable. There, the Supreme Court considered the totality of the "course of conduct" that coerced the defendant's confession, highlighting that there was a "culminating threat of mob violence." *Id.* at 567. That situation is entirely different from this one. And in *Payne*, the petitioner was not fed for a period of 25 hours, while Savory was given a candy bar on the first

evening and a hamburger on the second day of interrogation. *Id.* at 564.

And in *Blackburn v. Alabama*, 361 U.S. 199 (1960), the Court found that the petitioner's confession was involuntary because he was likely "insane and incompetent" when he confessed. *Id.* at 207. In *Culombe v. Connecticut*, 367 U.S. 568 (1961), the Court likewise highlighted the significance that the defendant had "a mental age of nine to nine and a half years," that his "request" for counsel was "in effect frustrated," and that he was held for five days before he confessed. *Id.* at 620, 625, 630. And in *Fikes v. Alabama*, 352 U.S. 191 (1957), mental capacity was also at issue: the petitioner was schizophrenic and was denied access to his lawyer. *Id.* at 193–95, 197. There's no evidence that Savory lacked mental capacity, distinguishing our case from those three.

Beyond controlling precedent, plaintiffs can argue that the violation "was so obvious that no reasonable officer could believe his actions were constitutional." *Villalobos*, 168 F.4th at 1603 n.2. But courts usually "reserve this escape hatch … for egregious factual scenarios." *Id.* And plaintiffs can also look to "all relevant caselaw" to see "whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (citation modified). But the out-of-circuit and state precedent Savory points to does not show with any certainty that we were about to recognize that the officers' behavior was clearly unlawful. The officers' conduct wasn't textbook (certainly not by today's standards), but it was not "so egregious and unreasonable that no reasonable official could have thought he was acting lawfully." *Id.* (citation

modified). As a result, we reverse the district court and hold that the officers are entitled to qualified immunity as to the coerced confession claim.

The analysis for the claim against private polygrapher Ed Bowers is the same. Even if Bowers was a state actor, his acts were not beyond a doubt unconstitutional. See *United States v. Jones*, 359 F.3d 921, 924 (7th Cir. 2004) (yelling at a defendant until he agrees with the interrogator is not enough to call the confession coerced). And even if Bowers was part of a conspiracy to coerce a confession from Savory, for the reasons we have expressed, there was no clearly established law showing that the officers' behavior was beyond a doubt unconstitutional.

IV

Savory argues that Detectives Cannon and Fiers, and Officers Teplitz and Pinkney, fabricated police reports of his confessions; he argues that when officers testified consistently with those reports, they violated his Fourteenth Amendment due process right to a fair trial. The detectives and officers asserted absolute immunity, which the district court denied.

To begin, we reject Savory's contention that the allegedly fabricated reports violated his Fourteenth Amendment right to a fair trial because they were used to secure charges against Savory and detain him. Any claim that fabricated reports led to Savory being unlawfully detained sounds in the Fourth Amendment, not the Fourteenth. See *Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020).

In *Patrick*, we clarified that for a fabricated evidence claim to survive, there must be fabricated evidence, the evidence must have been material, it must have been used against the

plaintiff at his criminal trial, and he must have been damaged as a result. *Id.* at 835. Because the reports were never used, admitted, or relied upon at trial, even if they were false, their production did not contribute to a violation of Savory's right to a fair trial. See *id.* Indeed, though law enforcement officers cannot "retroactively immunize" themselves from liability after introducing fabricated evidence at trial by testifying consistently with those reports, "if the evidence [was not] used against the defendant, he would not have been harmed by it." *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014). And testimony consistent with the reports is not enough to deny them absolute immunity. As we said in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2011), "trial testimony, standing alone" cannot subject officers to liability. *Id.* at 443. At worst, the false testimony—but not the reports—caused Savory harm. But testimony is covered by absolute immunity. *Briscoe v. LaHue*, 460 U.S. 325, 336 (1983).

REVERSED

JACKSON-AKIWUMI, *Circuit Judge*, concurring in part and dissenting in part. I agree that controlling precedent entitles the police officer defendants to qualified immunity on Johnnie Savory's Fourteenth Amendment destruction of evidence claim. But I would resolve this claim differently than my colleagues do, so I concur only in the judgment as to Part III.B of the majority opinion. Furthermore, I agree that the officers are entitled to absolute immunity on Savory's Fourth Amendment false testimony claim. So I join Part IV of the majority opinion in full.

As to the remaining claims, I part ways with the majority. My colleagues err procedurally by reversing the district court's denial of qualified immunity to the officers on Savory's Fourth Amendment unlawful detention claim. And they err substantively by concluding it was not clearly established by 1977 that the officers' interrogation techniques violated the Fifth Amendment. It clearly was, so the officers are not entitled to qualified immunity on this claim. I therefore respectfully dissent from Parts III.A and III.C of the majority opinion.

## I

I begin with Savory's Fourteenth Amendment destruction of evidence claim. The majority reaches the correct conclusion—that is, that the officers are entitled to qualified immunity—but I depart from its reasoning. I take issue with two aspects of the majority's analysis.

First, the majority incorrectly implies that the government no longer has an obligation to preserve exculpatory evidence once a criminal defendant's trial begins. This mischaracterizes the governing preservation-of-evidence caselaw, namely

*Arizona v. Youngblood*, 488 U.S. 51 (1988). In *Youngblood*, the Supreme Court neither explicitly nor implicitly limited its holding to the pre-trial context—the case's reasoning applies with equal force to a criminal defendant's post-trial rights. Indeed, at least one of our sister circuits has held as much. *See Yarris v. Cnty. of Delaware*, 465 F.3d 129, 142 (3d Cir. 2006) ("[T]he *Youngblood* decision did not indicate that it was limited to its temporal context."); *id.* (applying *Youngblood* to police detectives' "post-conviction conduct"). This approach makes sense. The government's destruction of exculpatory evidence during or after trial prevents a defendant from meaningfully availing himself of his post-conviction legal remedies. This is no less insidious than the government violating its obligation under *Brady v. Maryland* to disclose exculpatory evidence before trial. *Cf. Cannon v. Burge*, 752 F.3d 1079, 1098 (7th Cir. 2014) ("[E]fforts by state actors to impede an individual's access to courts may provide the basis for a constitutional claim under section 1983."). That's why this court has never held that the government's obligation to preserve exculpatory evidence runs only to the moment of trial.

Second, the majority makes two problematic declarations about the evidence at issue in this appeal—the hairs police found in the victim's hand and the sample fabric from Savory's pants. The majority says that "we cannot reach any conclusions about whether the [fabric] cutout and hairs had exculpatory value." Ante at 13. And it says "that it was not clearly established before 1984 that the government had a 'duty to take affirmative steps to preserve evidence on behalf of criminal defendants.'" *Id.* at 14 (quoting *California v. Trombetta*, 467 U.S. 479, 486 (1984)). Both assertions are dubious. For starters, my colleagues are wrong to equivocate about whether the evidence was exculpatory. The majority insists

that the evidence was merely "an avenue of investigation," and therefore not exculpatory. *Id.* at 14 (quoting *Youngblood*, 488 U.S. at 56 n.\*). Yet two pages earlier, the majority concedes that, at the very least, the hairs found in the victim's hand *were* exculpatory by acknowledging that they "didn't look like Savory's hair" and "could help identify another individual" who might have committed the murders. *Id.* at 12. That alone shows that the hairs destroyed by the state had exculpatory value in 1977.

Moreover, it's irrelevant whether the government had a duty before 1984 to preserve exculpatory evidence for criminal defendants. Savory does not tell us when the officers destroyed the hair and fabric. The evidence could have been destroyed immediately after Savory's first conviction, in the late 1970s. Or the evidence could have been destroyed sometime between 1984, when the Supreme Court decided *Trombetta*, and 2012, when Savory won his petition for post-conviction DNA testing. If the exculpatory evidence was destroyed in that nearly 30-year period, then its destruction likely violated clearly established law. But as it stands, there's not enough information in the record for us to determine whether Savory's rights were violated when the evidence was destroyed. Savory's claim therefore cannot be decided on this basis.

That said, the officers are entitled to qualified immunity on Savory's destruction of evidence claim for a different reason. Bad faith is a required element of the claim. *See, e.g.*, *Trombetta*, 467 U.S. at 488; *Youngblood*, 488 U.S. at 58. But Savory offers no evidence that the officers exhibited bad faith in destroying the hairs and fabric. Without proof of bad faith, Savory's claim fails. That's the narrowest, most sound way to resolve this part of Savory's appeal.

## II

Next, the majority's procedural error. The district court found that genuine disputes of fact precluded summary judgment for the officers on Savory's Fourth Amendment unlawful detention claim. These disputes, the court continued, meant that the officers were not entitled to qualified immunity on that claim, either. The officers filed this interlocutory appeal, and the majority now reverses the district court. Ante at 11. "Looking through the record," my colleagues say, "we were able to determine additional facts that were not genuinely disputed." *Id.* at 10. Using these facts, the majority conducts what is essentially a de novo review of the district court's summary judgment order. *Id.* at 10–11. The majority then concludes that because the officers had arguable probable cause to detain Savory, they are entitled to qualified immunity on his unlawful detention claim. *Id.* at 11.

This approach disregards the jurisdictional limits imposed on us by Congress and the Supreme Court. Generally, our jurisdiction is limited to deciding appeals from final decisions of the district courts. 28 U.S.C. § 1291. Interlocutory appeals, like this one, are the exception to the rule. *Johnson v. Jones*, 515 U.S. 304, 309 (1995). Still, our jurisdiction is limited: "we may review district court orders denying qualified immunity on interlocutory appeal only when the appellant brings a purely legal argument that does not depend on disputed facts." *Stewardson v. Biggs*, 43 F.4th 732, 734 (7th Cir. 2022) (citation modified)). "[I]f the district court finds a genuine issue of material fact exists, appellate courts lack jurisdiction to review the record, even if the appellate court perceives an error in the district court's reading of the summary judgment record." *Via v. LaGrand*, 469 F.3d 618, 623 (7th Cir. 2006) (citing *McKinney v.*

*Duplain*, 463 F.3d 679, 689–90 (7th Cir. 2006)). In these circumstances, "we may only consider whether the defendant is entitled to qualified immunity given the factual disputes found by the district court." *Id.* at 625.

*Via* and *Johnson* illustrate this approach. In *Via*, this court was faced with an interlocutory appeal from the denial of qualified immunity at summary judgment. *See id.* at 619–21. *Johnson*, the Supreme Court case from which *Via* drew its reasoning, had the same posture. *See* 515 U.S. at 307. In both cases, dismissal for lack of jurisdiction was the answer. *Via*, 469 F.4th at 625 ("Under *Johnson*, this court lacks jurisdiction to determine whether the summary judgment record sets forth a genuine issue of fact for trial."); *Johnson*, 515 U.S. at 319 ("[W]e hold that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial.").

Despite this binding authority, the majority justifies its jurisdiction-flouting approach by pointing to our opinion in *Mabes v. Thompson*. It's true that in *Mabes* our court "conduct[ed] our own review of the factual record." 136 F.4th 697, 702 (7th Cir. 2025). But the panel did so because the district court erred in its qualified immunity analysis. Instead of going "defendant-by-defendant and claim-by-claim," the district court grouped ten dissimilar defendants together, did a single qualified immunity analysis for all of them, and concluded none was entitled to qualified immunity on any of the plaintiffs' claims. *Id.* at 706. The district court's error in not stating which facts were in dispute as to each defendant or

claim led the panel to review the record and undertake its own qualified immunity analysis. *See id.* at 705–06.

The district court in Savory's case did not repeat the district court's error in *Mabes*. In this case, the district court correctly determined that there were genuine disputes of fact precluding summary judgment—and qualified immunity—for each of the officers implicated in Savory's unlawful detention claim. That ends the matter. Our limited jurisdiction prohibits us from disturbing this holding. *See Via*, 469 F.4th at 625; *Johnson*, 515 U.S. at 319. The majority has no authority to dig through the record, pull out new facts, and use them to usurp the district court's summary judgment finding.

### III

Lastly, the majority's substantive error. In its qualified immunity analysis for Savory's Fifth Amendment coerced confession claim, the majority disregards the similarities between Savory's case and the cases he and the district court cite. Instead, it zeroes in on minute differences between the cases. Based on these differences, my colleagues conclude that "in 1977, it was not beyond debate" that police officers violate the Constitution by browbeating children into confessing to murder. Ante at 15. I disagree.

The officers in this case are entitled to qualified immunity only if their interrogation techniques did not violate Savory's clearly established right to due process. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam). For a right to be clearly established, an officer must have been able to "'read' the relevant precedent beforehand and [must have] 'known' that it proscribed their specific conduct." *Zorn v. Linton*, 607 U.S. 568, 572 (2026) (per curiam) (quoting *City and Cnty. of San*

*Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)). Time and again, the Supreme Court has made clear that a litigant can establish that his constitutional right was clearly established by precedent even without "a case directly on point." *Rivas-Villegas*, 595 U.S. at 5; *see also District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018); *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam); *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). The fundamental question is whether there is precedent showing that "an officer acting under *similar* circumstances … was held to have violated the Constitution." *Zorn*, 607 U.S. at 572 (emphasis added) (citation modified).

In at least two Supreme Court cases decided before 1977, *Haley v. Ohio* and *Gallegos v. Colorado*, police officers violated the Constitution by behaving similarly to the officers who interrogated Savory. In *Haley*, a 1948 decision, a 15-year-old was interrogated by police who "work[ed] in relays" to "question[] him hour after hour." 332 U.S. 596, 599–600 (1948). There was no adult present to help the boy avoid confessing out of "fear" or "panic." *Id.* at 600. The Court held that the police violated the boy's constitutional rights, reasoning that:

> [t]he age of the petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, [and] the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction.

*Id.* at 600–01. Though the boy had been "advised of his constitutional rights before he signed the confession," the Court reversed Haley's conviction. *Id.* at 601.

So too in *Gallegos*, a 1962 decision. There, police extracted a murder confession from a 14-year-old boy after holding him for five days, during which he had no "adult protection" against his interrogators. 370 U.S. 49, 50, 54 (1962). This lack of protection, the Court observed, rendered the boy unable "to know, let alone assert," his constitutional rights. *Id.* at 54. Considering the "totality of the circumstances," including "[t]he length of the questioning, the use of fear to break a suspect, [and] the youth of the accused," the Court concluded that Gallegos's confession "was obtained in violation of due process." *Id.* at 52, 55. The Court reached this conclusion even though the boy had been advised of his right to counsel. *See id.* at 54. "To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights." *Id.* As it had done in *Haley*, the Court reversed Gallegos's conviction. *Id.* at 55.

Had the officers in this case read *Haley* or *Gallegos* before questioning Savory, they would have known that their actions were unconstitutional. Recall what the officers did to Savory: After collaring the 14-year-old at school, the officers persuaded the reluctant child to go with them to the police station. There, at least four officers interrogated Savory across two days. Savory repeatedly faced "rapid-fire, confusing questions" from "two or three officers at a time," which he "struggled to answer." The officers' questions shifted from chaotic to hostile. Although Savory was advised of his *Miranda* rights, at no point during his interrogation was he accompanied by an adult.

Police held and questioned Savory for more than eight hours before they called his father and told him that Savory was in custody. Before that call, Savory had sat for the first of

two polygraph tests the officers would convince him to take. Savory agreed to the polygraph after briefly speaking with his probation officer, because a police officer told Savory that if he took the test, he would be allowed to go home. But the officers did not release Savory once the test was over. Instead, they sent him to a juvenile detention center, where they picked him up the following morning and brought him back to the station for more questioning.

On the morning of his second day in custody, Savory saw and spoke to his father for the first time since being detained. Their conversation was brief. Savory's father abruptly left the station before Savory's interrogation resumed. After Savory's father left, officers took Savory to a bathroom and forced him to strip naked. Then, they plucked hair from his head, torso, and genitals.

The officers fed Savory only twice during his two days in custody: He was given a candy bar and soda for dinner on day one (the first food he had eaten all day) and a hamburger for lunch on day two. Throughout his interrogation, the officers repeatedly accused Savory of committing the murders, an accusation he denied. Only on his second night in custody did he break down and confess. As Savory testified in a deposition years later, an officer was "wording him along." Later that day, Savory recanted his confession.

All told, there is little daylight between *Haley*, *Gallegos*, and Savory's case. And the majority's efforts to distinguish *Haley* and *Gallegos* are wanting.

Start with *Haley*. The majority devotes outsized attention to the few differences between Haley's and Savory's situations instead of crediting the ways they are similar. For

example, the majority says that while Haley's "lawyer was re-
stricted from seeing him," "Savory met with his father and
probation officer." Ante at 16. That's true, but irrelevant. The
problem in *Haley* was that a boy faced a multi-hour police in-
terrogation by himself. Savory did too. Like Haley, Savory
was never accompanied by an adult while being interrogated.
And while Savory had brief conversations with both his fa-
ther and probation officer outside of the interrogation room,
neither served as "counsel" to aid him in understanding his
constitutional rights. *Haley*, 332 U.S. at 601. So in stressing that
Haley was isolated but Savory had fleeting interactions with
non-officer adults, the majority makes too much of a differ-
ence that's ultimately peripheral.

My colleagues also point out that Savory was given a *Mi-
randa* warning and Haley was not. That's also immaterial. One
of the main takeaways from *Haley* is that whether a teenaged
suspect is read his rights does not matter if he is facing the
police by himself. The *Haley* Court rejected the idea "that a
boy of fifteen, without aid of counsel, would have a full ap-
preciation" of his rights or would feel "a freedom of choice"
to decline questioning. *Id.* at 601. Telling a suspect about his
constitutional rights is not a check-the-box exercise, the Court
explained, and it refused to "give any weight to recitals which
merely formalize constitutional requirements." *Id.* So even if
Savory was given a *Miranda* warning and Haley was not, that
fact has little importance. The boys are similarly situated be-
cause both were alone during their interrogations and, be-
cause they were boys, neither could fully understand his con-
stitutional rights as told to him by police.

Finally, and most fundamentally, the majority's paring of
*Haley*—stressing the *Miranda* warning difference and focusing

on Haley's isolation—misses the larger point of the case. The *Haley* Court did not hold that Haley's confession was obtained unconstitutionally because the police did not tell him he could speak with a lawyer, or because "not even a gesture toward getting a lawyer for him was made." *Id.* at 600. Instead, the case turned on a combination of facts—Haley's age, his being interrogated through the night, and the length of his questioning, in addition to the fact he was alone throughout the ordeal. *Id.* at 600–01. The majority's fixation on Savory being given a *Miranda* warning, and on his briefly speaking with his father and probation officer, is therefore a red herring. Considering all the facts, it's apparent that Haley's and Savory's circumstances are sufficiently similar for *Haley* to clearly establish that the officers in this case unconstitutionally extracted a confession out of Savory.

The majority's attempt to distinguish *Gallegos* is equally unconvincing. My colleagues measure Savory's detention in hours, noting that he was held for "about 29 hours after he was first questioned" whereas Gallegos "was held for nearly five times as long." Ante at 17. I would put it more plainly: Savory confessed on his second day in custody, and Gallegos confessed on his fifth day in custody. Regardless, focusing on this difference is too myopic an approach given that Savory need only present similar—not identical—cases to satisfy qualified immunity's "clearly established" requirement. The commonalities between Gallegos and Savory put the officers on notice that their behavior violated the law. Both boys were fourteen years old when questioned by police. *Gallegos*, 360 U.S. at 54. Both were advised of their right to counsel, yet their youth made them unable to fully appreciate those rights without an adult's help. *See id.* Both were tried for murder based on confessions obtained outside of the presence of a lawyer,

parent, or friend. *See id.* at 50, 55. Again, it's of little importance that Savory briefly spoke with his father and probation officer—both he and Gallegos lacked an adult at their side during their interrogations. *Id.* at 53–55.

All told, the only way to deem Haley, Gallegos, and Savory dissimilar is by taking a slice-and-dice approach to their cases. But the truth is that had any of the officers in this case read *Haley* or *Gallegos*, that officer would have known his treatment of Savory violated the Constitution. And that's enough for Savory to defeat the officers' qualified immunity defense to his coerced confession claim.

## IV

It was clearly established in 1977 that police could not spend days berating a teenage boy into confessing to murder. Further, the majority's analysis of Savory's destruction of evidence claim is untethered from the record. And we have no jurisdiction to consider, let alone disturb, the district court's finding that Savory's unlawful detention claim should proceed. Because the majority flouts our jurisdictional limits, and because it disregards the unmistakably similar cases that defeat the officers' qualified immunity defense, I respectfully dissent in part.